NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (4th) 220009-U

NOS. 4-22-0009, 4-22-0010, 4-22-0011 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 13, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.T-C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Rock Island County |
| Petitioner-Appellee, | ) | Nos. 20JA5 |
| v. (No. 4-22-0009) | ) | 20JA6 |
| Janet C., | ) | 20JA35 |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* M.C., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v. (No. 4-22-0010) | ) | |
| Janet C., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* D.L., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v. (No. 4-22-0011) | ) | |
| Janet C., | ) | Honorable |
| Respondent-Appellant). | ) | Theodore G. Kutsunis, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirmed the trial court's finding that the minors were neglected because the finding was not against the manifest weight of the

evidence.

¶ 2　　　　　Respondent, Janet C., is the mother of D.L. (born May 2019), M.C. (born June 2018), and S.T-C. (born March 2017). In January 2020, the State filed petitions for adjudication of wardship, alleging M.C. and S.T-C. were neglected minors in that they lived in an environment injurious to their welfare because earlier in January 2020, their sibling, D.L. was taken to the hospital and diagnosed with severe head trauma. Respondent and her paramour gave conflicting stories about how the injury could have occurred. The petitions further alleged that respondent previously had a seven-year-old child removed from her care after the child suffered brain trauma. In February 2020, the State filed a petition for adjudication of wardship, alleging D.L. was an abused and neglected child who suffered physical injuries by other than accidental means.

¶ 3　　　　　In November 2021, the trial court conducted an adjudicatory hearing and adjudicated S.T-C., M.C., and D.L. neglected minors. In January 2022, the trial court conducted a dispositional hearing, found respondent unfit to care for the minors, and adjudicated the minors wards of the court.

¶ 4　　　　　Respondent appeals, arguing the trial court erred by (1) denying her motion to dismiss the petitions for failure to conduct an adjudicatory hearing within 90 days, (2) permitting Karri Belvel to act as guardian *ad litem* (GAL), and (3) adjudicating S.T-C. and M.C. neglected minors. We disagree and affirm.

¶ 5　　　　　　　　　　　　　　I. BACKGROUND

¶ 6　　　　　　　　　　　　　　A. The Petitions

¶ 7　　　　　January 2020, the State filed petitions for adjudication of wardship, alleging M.C. and S.T-C. were neglected minors in that they lived in an environment injurious to their welfare

because on January 14, 2020, their sibling, D.L. was taken to the hospital and diagnosed with severe head trauma. See 705 ILCS 405/2-3(1)(b) (West 2018). The petitions further alleged that respondent and her paramour, Michael C., gave conflicting stories about how the injury could have occurred. At first, they suggested D.L. "had been with a babysitter the night before who might have been responsible." Later, respondent told detectives with the Rock Island Police Department "that all three children had in fact been at home that evening with [Michael C.] while [respondent] was at work."

¶ 8 The petition alleged a treating neurologist "indicated [D.L.'s] brain bleed happened within 12 to 24 hours of the CT scan which was taken around 4 a.m. on January 14." The petition also alleged respondent had a seven-year-old child "who was previously removed from [respondent's] care after suffering severe brain trauma."

¶ 9 The same day the petitions were filed, the trial court conducted a shelter care hearing and placed temporary custody and guardianship of S.T-C. and M.C. with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 10 In February 2020, the State filed a petition for adjudication of wardship, alleging D.L. was a neglected and abused minor whose "environment [wa]s injurious to her welfare and who has been abused with physical injury by other than accidental means." See *id.* § 2-3(1)(b). The petition alleged all of the same information as the previous petitions but also included the following: "Doctors have stated that this [brain] damage is consistent with a violent front to back shake or repeated blows to the head on a soft surface like a bed" and "[Respondent] has been charged [criminally] with Aggravated Battery to a Child."

¶ 11 The same day the petition relating to D.L. was filed, the trial court conducted a shelter care hearing as to D.L. At that hearing, respondent stipulated that an immediate and

urgent necessity existed for the removal and placement of D.L. The court accepted the stipulation and placed temporary custody and guardianship with the guardianship administrator of DCFS.

¶ 12                                    B. Relevant Procedural History

¶ 13         Over the summer of 2020, the trial court conducted three status hearings. Respondent did not appear at any of these hearings because the State did not arrange for her to be transported to court from jail. At each hearing, respondent's attorney requested continuances on respondent's behalf because (1) respondent had a pending criminal case involving the same conduct as alleged in the petitions and (2) counsel wanted to let the criminal case proceed before addressing the petitions. The court granted respondent's counsel's requests for continuances.

¶ 14         In September 2020, at a status hearing, respondent appeared with her counsel, who requested another continuance, making the following representation to the court:

> "Well, Your Honor, I've talked to mother for quite awhile this morning.
> She would like to request a continuance of the pretrial today. This is the first time
> that she's been brought over to court since March 9th, so this is our first
> opportunity to talk. She has a status on her [criminal] case on October 9th."

The State did not object to the continuance, and the trial court continued the matter.

¶ 15         In November 2020, at the next status hearing, respondent told the trial court she believed her attorney had a conflict of interest and respondent wanted a different attorney. Respondent alleged her current counsel previously represented respondent's twin sister in a criminal matter. Respondent's counsel stated she did not believe she had a conflict but noted that respondent refused to speak with counsel. The court permitted respondent's counsel to withdraw based on "a breakdown of the attorney-client relationship" and appointed new counsel.

¶ 16         Immediately after the trial court permitted counsel to withdraw, the GAL, Derek

- 4 -

Hancks, interjected and asked to address the court about a potential conflict. Hancks informed the trial court that "Karri Belvel has represented [respondent's twin sister] quite a bit. I didn't know the connection, but I don't know if that's any problem." The court replied, "We're going to Chinese wall it, then. You can stay on. *** Ms. Belvel, though, will not be able to appear for you." (Respondent represents on appeal that "Belvel was in private practice with Mr. Hancks, who was the county guardian *ad litem*." Hancks was later appointed as associate judge, and Belvel became the county GAL. We note that the record reflects Belvel was substituted for Hancks as GAL in February 2021 and she appeared at hearings in that capacity going forward without objection.)

¶ 17         At each of the next three status hearings, the State and respondent's counsel agreed the case should be continued so (1) counsel, who was new to the case, could become familiar with it and the corresponding criminal case and (2) the parties could find out whether the criminal case was going to go to trial. The trial court granted the agreed requests for continuances.

¶ 18         In February 2021, at the next status hearing, the State noted the cases were a year old and requested (1) a permanency review hearing and (2) an adjudicatory hearing. Respondent's counsel made an oral motion to "continue this case until a time that the criminal matter involving [respondent] is resolved. We are possibly looking at August or September for that date, but we would like to continue it *** four months or so to sort of check in periodically." The trial court stated, "I think due process would require that we do nothing in this court to prejudice [respondent's] criminal case." Noting that the speedy trial statute had been suspended by the Illinois Supreme Court due to the Covid-19 pandemic, the court agreed to continue the case to see if "something gets resolved in the criminal courts."

¶ 19        At the March hearing, the State represented that respondent wanted to continue the case for a couple of months to see what happened in the criminal case. The State proposed a May 2021 status date, no one objected, and the trial court agreed to the continuance.

¶ 20        In May 2021, the State asked the trial court to schedule an adjudicatory hearing, noting that respondent's criminal case was unlikely to go to trial or be resolved anytime soon. Respondent objected because of the criminal case arising from the same facts. Respondent argued, "That's why we've been attempting to delay this for so long, because presenting her defense might hinder her ability to defend herself in the criminal matter."

¶ 21        The trial court agreed that respondent had rights but noted that "the children have rights, too, and they need permanence, one way or another." The court informed respondent that she would not be required to testify and could invoke her fifth amendment privilege against self-incrimination at any hearing. Accordingly, the court set the case for an adjudicatory hearing.

¶ 22        In July 2021, counsel for the respondent father moved to continue on the grounds that the DNA testing, requested in September 2020, had not been completed. All parties and the court reluctantly agreed that the case should not proceed to adjudication without the DNA results. The court continued the case for another status hearing.

¶ 23        Immediately after the trial court continued the case, the following exchange:

         "THE COURT: Okay. Now, we also need to address the guardian *ad litem* situation.

         MS. BELVEL [(GAL)]: Your Honor, I just wanted to disclose to the Court—I believe it has been previously disclosed, but I have represented [respondent's] twin sister as well as her grandparents in matters completely unrelated to this case.

THE COURT: And my first question is how long ago?

MS. BELVEL: I believe I represented her sister six to seven years ago. And her grandparents it's been more recent in a guardianship case.

THE COURT: Okay. The guardianship with her grandparents have anything to do with the three minors who are in this court?

MS. BELVEL: It does not.

THE COURT: Was [respondent] a party to that guardianship petition?

MS. BELVEL: No.

THE COURT: In reference to your representation of her twin sister, did it concern any of the three children in this court?

MS. BELVEL: No.

THE COURT: And she didn't enter her appearance in any of those cases, correct?

MS. BELVEL: No. I have never met [respondent] until this court case.

THE COURT: All right. Then I don't believe that's a conflict, so we'll go forward."

¶ 24 At the next hearing, in September 2021, respondent asked to continue the case because she was hiring new counsel for her criminal case and potentially the juvenile cases. Again, the parties and the trial court reluctantly agreed to continue the case.

¶ 25 In October 2021, the parties set a date for an adjudicatory hearing. (We note that respondent did not hire new counsel to represent her in the juvenile cases.)

¶ 26                          C. The Adjudicatory Hearing

¶ 27 In November 2021, the trial court conducted an adjudicatory hearing.

¶ 28                                    1. *Respondent's Motions To Dismiss*

¶ 29          Before presenting evidence, respondent moved to dismiss the petitions for failure to conduct an adjudicatory hearing within the timeframe set forth in section 2-14(c) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-14(c) (West 2018)), which requires the hearing to be held within a maximum of 120 days after the service of summons, unless the parties have waived the timeframe and the court has approved. Respondent argued that the pandemic constituted good cause for continuing the case but pointed out that the pandemic was not offered as a reason to continue the case by any party or the court. Respondent also contended that the record did not demonstrate that all parties agreed to every continuance.

¶ 30          The trial court examined the docket and court file and recounted, in detail, its recollection of the timeline of events. The court found, "Any delays were by agreement. Most of the time, the overriding reason for these delays was the pending criminal case." The court denied the motion, explaining as follows: "I think there's good reasons to. There was [*sic*] consents. And I did not object. I agreed to it all along. We had COVID; we had mother getting a new attorney; we had other delays. So that is my ruling."

¶ 31                                    2. *The State's Evidence*

¶ 32          Patrick Perion testified that, for the last 30 years, he had worked as a child protection specialist for DCFS and he performed an investigation in this case. Perion stated that on January 14, 2020, he was called to the emergency room to investigate D.L.'s head injury. At the hospital, at 5 a.m., Perion briefly spoke to respondent as she was leaving (D.L. was being transferred to an Iowa pediatric hospital), and respondent said (1) she was not going to talk to Perion and (2) she did not know what happened because she was at work.

¶ 33          Perion learned from the hospital staff and treating physicians that D.L. had been

admitted around 1 a.m. and a subsequent computed tomography (CT) scan showed massive brain trauma that required surgery at another hospital. Without objection, the trial court admitted medical records from the hospital documenting the injuries and noting that there was "a concern for possible non-accidental trauma."

¶ 34 At around 8 a.m., Perion, accompanied by police officers, went to respondent's address, where she lived with her paramour and three children. Because no one would answer the door to respondent's residence, a maintenance person unlocked the door for the group. Perion testified that, when he entered the house, S.T-C. and M.C. were asleep on the couch and respondent and Michael C. were asleep in the main bedroom. Respondent had not accompanied D.L. to the Iowa pediatric hospital.

¶ 35 After consultation with his supervisor, Perion took protective custody of S.T-C. and M.C. Perion acknowledged that no one had any specific concerns about injury to S.T-C. and M.C.; instead, they were removed because the severity of the injuries to D.L. suggested an injurious environment and removal was necessary as a precaution.

¶ 36 Perion testified that he attempted placement with the children's grandmother, but she could not take them. The grandmother had already taken respondent's oldest child, who was seven years old and had been removed from respondent's care at age two due to head trauma.

¶ 37 Perion testified that respondent and Michael C. gave multiple explanations for D.L.'s injuries. In their first statement, given at their home the morning after D.L. was admitted to the emergency room, respondent and Michael C. said S.T-C. and M.C. had been with their grandmother and D.L. was with a babysitter. Respondent picked them all up after work around midnight and brought them home. D.L. began acting strange, and respondent called 911.

¶ 38 Perion testified that later in the day, respondent and Michael C. came to the police

department and gave a different statement. In their second statement, they explained that all three children had been at home with Michael C. while respondent was at work. Respondent came home from work a little after midnight and prepared a bottle for D.L., who was in her car seat on top of a changing table. Somehow, two-year-old S.T-C. got up on the table, tried to give the bottle to D.L., and knocked D.L. and the car seat onto the floor.

¶ 39    Perion testified that he stayed in contact with several different groups investigating the incident and caring for D.L., who remained in the hospital in Iowa for several weeks. A radiologist examined the CT scan, taken between 4 and 4:30 a.m., and determined that the "hyperacute" injuries occurred "within just a few hours of imaging." Perion explained that the scan showed other injuries to D.L.'s brain, but the treating physicians all opined that the injuries occurred within several hours of the scan's being taken.

¶ 40    Perion testified about the medical opinions for the injuries. The pediatric ophthalmologist had opined, "[T]he amount of damage to both eyes was not consistent with a fall from a changing table. It would be consistent with a fall from a two-story building." Another pediatric specialist told Perion "the injuries were consistent with either a very hard front-to-back jerking motion or possibly repeated blows to the head on a softer surface like a mattress."

¶ 41    The State offered, and the trial court admitted without objection, medical records from the Iowa hospital detailing (1) the injuries, (2) the medical opinions that the injuries occurred within hours to a day before the imaging, (3) why the medical staff ruled out accidental and possible medical causes, and (4) the conclusions that physical abuse or other nonaccidental means most likely caused the injuries.

¶ 42    On cross-examination, Perion testified about the earlier incident of head injuries to respondent's child. The injuries occurred five years ago when then child was two years old.

Perion stated (1) respondent's then boyfriend was criminally charged, (2) respondent was never charged or convicted of any crime, and (3) DCFS concluded the allegations were unfounded as to respondent.

¶ 43    Perion testified that respondent's employer confirmed that she was working the night of D.L.'s injuries until midnight. Perion further testified that Michael C.'s version of events was that respondent got home between 12 and 12:30 a.m. and was agitated with him for not doing the dishes and changing the baby's diaper. Michael C. went to the bathroom to have a smoke and cool off when he heard a bang from the bedroom. When he came out, respondent was holding D.L., who was unresponsive and seemed to be having a seizure. They then called 911. Perion explained that Michael C. told police about the changing table when he and respondent were together, but when he was interviewed separately, he then said he was in the bathroom and did not see D.L. fall.

¶ 44    Perion stated he was not aware of any charges against Michael C. related to this incident. Perion testified that the police were able to contact the babysitter who respondent and Michael C. originally reported had been watching the child at the time of the injury, but the babysitter told the police that she had not seen the child in weeks.

¶ 45    When Perion was asked whether "there [was] ever a clear indication as to the actual event that caused the injury," he responded that treating physicians "brought it down to three possibilities: Either a violent front-to-rear shaking motion, or repeated head hitting on a softer surface like a bed, or a combination of violent shaking and the head connecting with a solid surface."

¶ 46    The State rested, and respondent did not present any evidence.

¶ 47                        3. *The Arguments of the Parties*

¶ 48 The State argued that (1) the severity of the injuries, (2) the changing stories that offered implausible and inadequate explanations for D.L.'s injuries, and (3) the determination that the injuries happened within a few hours of 4 a.m., established by clear and convincing evidence that D.L. was physically abused. For those same reasons, the State believed S.T-C. and M.C. were subject to an injurious environment.

¶ 49 Respondent argued that the evidence suggested Michael C. was the most likely person to have committed the abuse to D.L. and nothing suggested this was anything other than a one-off incident. Respondent came home from work and immediately called for help, which suggested she (1) was not the abuser and (2) was diligent in protecting the health and welfare of her child. Respondent acknowledged that fault was not important at this stage, but she emphasized that her situation was not akin to a parent standing idly by and letting abuse occur.

¶ 50 The trial court took the case under advisement so it could review the exhibits and its notes from the testimony.

¶ 51 4. *The Trial Court's Ruling*

¶ 52 In December of 2021, the trial court issued its oral ruling finding all three minors neglected as alleged in the petitions. The court began by noting that Perion's uncontroverted testimony was that the injuries to D.L. were more likely than not caused by physical abuse. The court continued, "The medical evidence presented clearly shows the Court that it is more likely than not that the baby was either violently shaken in a back and forth motion or the victim of the repeated acts of the baby's head hitting a softer surface, like a mattress or a bed or a combination of the two."

¶ 53 The trial court concluded as follows:

"Although the evidence presented does not definitively show exactly how

- 12 -

the baby was injured, the medical records indicate that the cause was, again, one of the three possibilities that I earlier mentioned and that it was perpetrated by a person. It was physical abuse. Likewise, the time of injury was not definitively given, but the experts indicate that the time that [respondent] and [Michael C.] were in the house together is within the realm of when the occurrence could have happened.

In juvenile court, the State need not prove a parent or responsible person personally participated in acts of abuse or neglect. But a parent does have an affirmative duty to protect a child from harm. In this case, [respondent] indicated to the police that she was home when the baby fell off the changing table. The stories of the two adults in the home changed from the baby at the babysitter to the 2-year-old pushing the baby off the changing table or hearing a loud thump or bang and then seeing [respondent] holding the baby.

Because of the sequence of events with [respondent] not taking personal responsibility for the occurrence and giving two different completely divergent explanations of the cause of the injury, coupled with the serious injury suffered by the baby by the physical abuse and the fact that the older children were present or, in the case of [respondent's] second explanation of the 2-year-old daughter causing the injury, I find that there is a factual basis present which supports the State's petition alleging neglect and abuse. I find that there is a preponderance of evidence in the record to support the Court's findings."

¶ 54                             D. The Dispositional Hearing

¶ 55        In January 2022, the trial court conducted a dispositional hearing at which it

entered a written order finding that it was in the best interest of S.T-C., M.C., D.L., and the public that the minor children be made wards of the court and adjudicated neglected minors. As part of its factual basis for finding family reunification unsuccessful, the court wrote, "The court has made findings that the minor[s'] sibling sustained abusive injuries." The court further found respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors. The court indicated its finding was "based on the prior finding." The court placed guardianship and custody of all three minors with the guardianship administrator of DCFS.

¶ 56        This appeal followed.

¶ 57                                II. ANALYSIS

¶ 58        Respondent appeals, arguing the trial court erred by (1) denying her motion to dismiss the petition for failure to conduct an adjudicatory hearing within 90 days, (2) permitting Karri Belvel to act as GAL, and (3) adjudicating S.T-C. and M.C. neglected minors. We disagree and affirm.

¶ 59                        A. Expedited Appeal Deadline

¶ 60        Rule 311(a) provides, "Except for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Respondent's notice of appeal was filed in January 2022. In March 2022, this court dismissed the appeal because respondent failed to file an appellate brief. Later that same month, this court vacated that dismissal, and respondent subsequently timely filed a brief requesting oral argument. This court granted that request and conducted oral arguments in June 2022. Given respondent's (1) missing the initial deadline for an appellate brief and (2) requesting and being afforded oral argument, we conclude good cause exists for issuing this order after 150

- 14 -

days of the filing of the notice of appeal.

¶ 61                                    B. Timeliness of the Adjudicatory Hearing

¶ 62          Respondent first argues that the trial court erred by denying her motion to dismiss

the petition because the adjudicatory hearing did not take place within 90 days as required by

statute. See 705 ILCS 405/2-14(b) (West 2018). Respondent argues that the only exceptions are

for "good cause," which the statute specifically explains "[n]either stipulation by counsel nor the

convenience of any party constitutes good cause." *Id.* § 2-14(c). The State responds that

(1) subsection (d) of the statute contains a catch-all provision that provides for continuances by

agreement of the parties and the court and (2) respondent agreed to all of the continuances in this

case. We agree with the State.

¶ 63          Section 2-14 provides as follows:

>          "(b) When a petition is filed alleging that the minor is abused, neglected or
>
>          dependent, an adjudicatory hearing shall be commenced within 90 days of the
>
>          date of service of process upon the minor, parents, any guardian and any legal
>
>          custodian[.] ***
>
>                                             * * *
>
>          (d) The time limits of this Section may be waived only by consent of all parties
>
>          and approval by the court." *Id.* §§ 2-14(b), (d).

¶ 64          Here, the trial court expressly considered respondent's argument and reviewed the

record. Based on that review, and its own recollection, the court found that all of the

continuances were by agreement of the parties and the court or otherwise at the request of

respondent. The record supports the trial court's findings.

¶ 65          In the background, we earlier set forth the general procedural history of this case

and several specific examples of continuances either (1) at respondent's request or (2) by agreement of the parties and the court. We need not reiterate those examples or explore any others. After examining each of the continuances, we conclude that the trial court did not err when it denied respondent's motion to dismiss.

¶ 66        We briefly note that, although the trial court did not violate the letter of the statute when the parties agreed to continue the case, we are concerned that the spirit of the law was not followed to the detriment of the minors. The 90-day time limit protects not only parents but also children. Children need stability and permanency and should not be left in limbo. The trial court's concern about respondent's criminal case is understandable, but that case was not an impediment to conducting an adjudicatory hearing. See *In re D.P.*, 327 Ill. App. 3d 153, 160-61, 163, 763 N.E.2d 351, 357, 359 (2001) (noting that pending criminal case against father did not require continuance of adjudicatory hearing where father could assert fifth amendment rights).

¶ 67        We remind trial courts that wardship cases should proceed in a timely manner consistent with the goals and purposes of the Act. Our conclusion that the trial court here properly followed the statute should not be construed as an endorsement of the two-year delay in this case.

¶ 68                              C. Conflict of Interest

¶ 69        Next, respondent argues that the GAL had a conflict of interest, based on her prior representation of respondent's relative, that prevented her from be able to serve as a GAL. Respondent does not support her argument with any citations to legal authority. Further, respondent failed to raise this issue in the trial court. For these reasons, she has forfeited the issue. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *In re T.C.*, 2021 IL App (2d) 200691, ¶ 15.

¶ 70        Forfeiture aside, the trial court conducted an examination of the GAL at the July

2021 hearing and concluded no conflict existed. We see no error in the trial court's conclusion.

¶ 71                                    D. Neglect Findings

¶ 72         Last, respondent argues that the trial court erred by finding S.T-C. and M.C. were

neglected minors based on a theory of anticipatory neglect. Respondent contends that the State

failed to present any evidence that S.T-C. and M.C., who were no longer infants, were at any risk

of injury or neglect. We disagree.

¶ 73                          1. *The Applicable Law and Standard of Review*

¶ 74         The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018))

provides a systematic framework for determining when a minor can be removed from his or her

parents and made a ward of the State. *In re A.P.*, 2012 IL 113875, ¶ 18, 981 N.E.2d 336. A trial

court must make a finding of abuse, neglect, or dependence regarding a minor before it can

adjudicate the minor a ward of the court. 705 ILCS 405/2-10 (West 2018). If a trial court finds a

minor is neglected, then the court holds a dispositional hearing at which the "court determines

whether it is consistent with the health, safety and best interests of the minor and the public that

the minor be made a ward of the court." *A.P.*, 2012 IL 113875, ¶ 21.

¶ 75         The Illinois Supreme Court has described an adjudication of neglect based on an

injurious environment as follows:

> "[A] neglected minor includes any minor under 18 years of age whose
>
> environment is injurious to his or her welfare. [Citation.] Generally, neglect is
>
> defined as the failure to exercise the care that circumstances justly demand.
>
> [Citation.] This does not mean, however, that the term neglect is limited to a
>
> narrow definition. [Citation.] As this court has long held, neglect encompasses
>
> willful as well as unintentional disregard of duty. It is not a term of fixed and

measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes. [Citations.] Similarly, the term injurious environment has been recognized by our courts as an amorphous concept that cannot be defined with particularity. [Citation.] Generally, however, the term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. [Citation.]" (Internal quotation marks omitted.) *A.P.*, 2012 IL 113875, ¶ 22.

¶ 76 "On appeal in a juvenile proceeding, a reviewing court will not reverse a trial court's determination of abuse or neglect unless it is against the manifest weight of the evidence." *In re An. W.*, 2014 IL App (3d) 130526, ¶ 55, 17 N.E.3d 878. "A finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion." *Id.* "Under the manifest-weight-of-the-evidence standard, a reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." (Internal quotation marks omitted.) *In re Parentage of W.J.B.*, 2016 IL App (2d) 140361, ¶ 25, 68 N.E.3d 977.

¶ 77                                     2. *This Case*

¶ 78 This case is nearly identical to a recent Illinois Supreme Court decision in *In re Z.L.*, 2021 IL 126931. In *Z.L.*, the supreme court rejected the respondent's claim that the trial court erred when it found that Z.L.'s older siblings were neglected based on the abuse to Z.L. Notably, the supreme court pointed out that (1) the State's case did not rely exclusively on the anticipatory neglect doctrine and (2) the trial court's decision never mentioned the respondent's

prior instances of neglect. *Id.* ¶ 87. Instead, the court upheld the neglect finding because (1) "the trial court repeatedly stated it was not identifying a perpetrator" (*id.* ¶ 78), (2) "one of the parents had to have at some point contributed to the injury" (*id.*), (3) the abuse occurred in the family home (*id.*), and (4) the siblings were present and lived in the home at the time of the injury (*id.* ¶ 75). The court noted that "proof of abuse or neglect of one minor is admissible on the issue of abuse or neglect of other minors for whom the parents are responsible," and "[b]ased on the foregoing, we cannot say the trial court's findings of neglect with regard to the siblings were against the manifest weight of the evidence." *Id.* ¶ 87.

¶ 79 We acknowledge that each case involving allegations of neglect are *sui generis*. *Id.* ¶ 58. But we can see no meaningful difference between the facts of this case and those addressed by the supreme court in *Z.L.* Here, as there, the trial court repeatedly stated that it was not determining who caused D.L.'s injuries. The court found, based on the medical evidence, that the injury (1) was most likely not accidental, (2) even if it was accidental, it was still the result of neglect, and (3) the injury occurred during a time when both respondent and Michael C. were home with the children. The court explicitly mentioned that the abuse occurred while the siblings were present and never mentioned respondent's prior indicated finding of abuse or neglect.

¶ 80 The trial court also expressed concern based on the conflicting stories respondent and Michael C. gave to the police, medical staff, and investigators, including alleging that a babysitter who had not seen the child in weeks was watching D.L. earlier that night. We conclude that the trial court's findings, taken together, are not against the manifest weight of the evidence.

¶ 81 III. CONCLUSION

¶ 82        For the reasons stated, we affirm the trial court's judgments.

¶ 83        Affirmed.