NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250493-U

NOS. 4-25-0493, 4-25-0494, 4-25-0495 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 1, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.T-C., M.C., and D.L., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Rock Island County |
| Petitioner-Appellee, | ) | Nos. 20JA05 |
| v. | ) | 20JA06 |
| Janet C., | ) | 20JA35 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Clayton R. Lee, |
| | ) | Judge Presiding. |

---

JUSTICE DeARMOND delivered the judgment of the court.
Justices Steigmann and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment, finding no issue of arguable merit could be raised on appeal.

¶ 2    In January and February 2020, the State filed petitions for adjudication of wardship regarding S.T-C., M.C., and D.L., the minor children of respondent mother, Janet C. The trial court granted the petitions, adjudicating the children neglected and making them wards of the court. Respondent appealed the court's neglect findings concerning S.T-C. and M.C., which we affirmed. *In re S.T-C.*, 2022 IL App (4th) 220009-U, ¶¶ 78-82.

¶ 3    In April 2025, the State filed an amended motion to terminate respondent's parental rights, and the trial court conducted a fitness hearing and a best interests hearing.

Respondent failed to appear at the hearings, no reason for her absence was provided, and the court denied her counsel's motion for a continuance. The court found respondent to be an unfit parent pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) and found it was in the children's best interests to terminate her parental rights. Respondent appealed.

¶ 4    In July 2025, appellate counsel moved to withdraw as counsel and filed an accompanying memorandum, asserting no arguably meritorious issue could be raised on appeal. Respondent objected to appellate counsel's motion, arguing her appeal has merit because (1) the trial court denied hearing counsel's motions for a continuance and conducted the fitness and best interests hearings in her absence and (2) witnesses during the hearings presented hearsay testimony, to which hearing counsel did not object. For the following reasons, we grant the motion to withdraw and affirm the trial court's judgment.

¶ 5                     I. BACKGROUND

¶ 6    On January 16, 2020, the State filed a petition alleging S.T-C. and M.C. were neglected because their environment was injurious to their welfare. *S.T-C.*, 2022 IL App (4th) 220009-U, ¶ 7. The petition alleged that, on January 14, 2020, the Illinois Department of Children and Family Services (DCFS) received a report indicating their seven-month-old sibling, D.L., had been taken to the hospital due to "severe head trauma," which CT scans showed to be "a massive subdural hematoma" and "massive edema" on the right side of her brain. The petition noted respondent had another child "who was previously removed from her care after suffering severe brain trauma." The trial court conducted a shelter care hearing on the same day, after which it placed the children's temporary custody and guardianship with DCFS. *S.T-C.*, 2022 IL App (4th) 220009-U, ¶ 9.

¶ 7    On February 28, 2020, the State filed a petition alleging D.L. was a neglected and

abused minor based on the injuries described above. *S.T-C.*, 2022 IL App (4th) 220009-U, ¶ 10. On the same day, the trial court conducted a shelter care hearing, where respondent stipulated an immediate and urgent necessity existed for D.L.'s removal and placement. *S.T-C.*, 2022 IL App (4th) 220009-U, ¶ 11. The court accepted the stipulation and placed D.L.'s temporary custody and guardianship with DCFS. *S.T-C.*, 2022 IL App (4th) 220009-U, ¶ 11.

¶ 8        On April 22, 2024, the State petitioned to terminate respondent's parental rights, alleging she was an unfit parent as defined in the Adoption Act because she failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2024)), failed to make reasonable efforts toward the children's return to her care during multiple nine-month periods (750 ILCS 50/1(D)(m)(i) (West 2024)), and failed to make reasonable progress toward the children's return to her care during the same nine-month periods (750 ILCS 50/1(D)(m)(ii) (West 2024)). On April 4, 2025, the State amended the petition to cover the nine-month periods from January 13, 2022, through October 13, 2022, October 14, 2022, through July 14, 2023, and February 1, 2024, through November 1, 2024.

¶ 9        On March 28, 2025, during a permanency review hearing attended by respondent and her counsel, the following exchange occurred:

> "THE COURT: The goal's been changed to substitute care pending
>
> termination of parental rights. That hearing is already set, correct?
>
> MS. CURL [(ASSISTANT STATE'S ATTORNEY)]: Yes, it is, Your
>
> Honor.
>
> THE COURT: What date is that, just to remind all the parties?
>
> MS. CURL: April 28th at 10:00 a.m."

¶ 10        Respondent failed to appear at the hearing on April 28, 2025. Her counsel moved

for a continuance, saying, "My client, [respondent], is not present. She's typically present. I do not know why she isn't here this morning, but I would ask for another date to enable her to be here." The State objected, arguing its petition to terminate had been pending for over a year, the children's cases were opened in 2020 and had been in the system "for far too long," respondent was aware of the date of the hearing, and no explanation was provided for her absence. The trial court denied the motion to continue.

¶ 11　　　　　Rebecca Clark testified she was a caseworker with the Center for Youth and Family Solutions (CYFS) assigned to S.T-C., M.C., and D.L. from August 2021 until October 2023. Respondent was in the Rock Island County jail when Clark was assigned to the case. Clark informed respondent that she was required to complete a mental health assessment and a psychological evaluation and follow any resulting recommendations. Respondent was released from jail in December 2021, and she completed her mental health assessment in July 2022 and her psychological evaluation in October 2022. The assessment and evaluation recommended respondent participate in individual counseling, take parenting classes, and complete a parenting capacity assessment.

¶ 12　　　　　Clark recommended respondent to a mental health service provider through CYFS, but respondent did not participate in services there. Clark was unable to contact other potential providers because respondent refused to sign the necessary releases. One facility reported respondent scheduled four appointments with them, but she did not attend any of those appointments. In the summer of 2023, respondent indicated she was attending counseling sessions with Green Counseling Services in Iowa, but when Clark contacted them, respondent's "participation with them had already ceased as a result of her not engaging with them." Clark testified respondent had scheduled four appointments there, but she "only attended half of one of

- 4 -

them."

¶ 13        After respondent was released from jail, she did not initially begin having visits with the children because "a condition of her bond release was that she couldn't have contact with children under 10 [years old]." In May 2022, DCFS confirmed it had discretion over visitation, and it determined therapeutic visitation would be appropriate because the children "were showing a lot of signs of *** trauma," and standard visitation with respondent might negatively impact them. To begin therapeutic visitation, the children and respondent needed to establish their own respective therapists, who would be present to supervise visits once both therapists determined visits would be healthy for their respective patients. Because respondent did not attend her scheduled counseling sessions, she never had an established individual therapist. As a result, therapeutic visits could not be scheduled. Clark repeatedly communicated to respondent the necessity of engaging in individual counseling in order to begin therapeutic visitation. Respondent indicated she understood what was required, and she claimed she was "happy to do whatever it took for her children." However, no therapeutic visits took place because respondent did not engage in the necessary individual counseling.

¶ 14        Respondent was also required to maintain stable income and housing. Over the course of Clark's involvement with the case, respondent said she worked for John Deere, worked as a hairdresser, and worked for a family member. Each time, Clark asked respondent to provide proof of income, either in the form of pay stubs or by signing releases to allow Clark to contact respondent's employer. Respondent failed to sign any releases, and she provided proof of income just once. Clark confirmed respondent had a lease and was current with her payments, but respondent would not let Clark inspect the residence to determine whether it was safe for the children. Clark made several attempts to set an inspection date, but respondent provided different

excuses to prevent the inspection from happening—she would tell Clark the residence was not ready, or she was busy and would not be home, or she was no longer living there but had not moved all of her things out of the residence.

¶ 15　　Clark testified respondent sent no cards, gifts, or letters to the children during her involvement in the case. Respondent did not inquire into what medical equipment and medications were necessary to care for D.L., who had significant medical needs. Respondent had no contact with D.L. after D.L. came into the care of DCFS. Respondent did not have any visits with S.T-C. and M.C. after December 2021.

¶ 16　　Kathie McAdams was the CYFS family caseworker currently assigned to the children's cases. When McAdams became involved in the cases in January 2024, respondent was not engaged in any required services, nor had she completed any services. In August 2024, respondent discussed engaging in individual counseling with John Sample of Black Hawk Psychology. Sample contacted McAdams because he "wanted to know about [respondent] and what was going on." Based on his interaction with respondent, Sample did not believe respondent was being truthful and did not think he could work with her. Ultimately, respondent did not engage in or complete individual therapy with Sample.

¶ 17　　McAdams was never able to visit respondent's residence to conduct a home safety inspection because respondent asked her not to come, saying she would be moving soon or she was not staying in one place for long. Respondent stopped communicating with McAdams in December 2024. Respondent indicated she had an ongoing investigation with the Iowa Department of Human Services (DHS) due to the birth of another child in that state, and she claimed she was told not to continue working with DCFS. When McAdams subsequently saw respondent in court, respondent refused to speak with her.

¶ 18    At no point during McAdams's involvement in the case did respondent visit S.T-C. or M.C. because she did not do what was required to establish therapeutic visitation. Respondent was required to maintain a stable income, but she did not provide documentation supporting her assertions that she was working at Amazon and Kraft. Respondent never sent any cards, gifts, or letters to the children. Respondent did not e-mail McAdams to ask how the children were doing.

¶ 19    McAdams testified a DHS caseworker contacted her to discuss respondent's new case relating to the baby respondent recently had. That child initially came into the care of DHS, then into foster care, and eventually, the child "was sent home to [the child's] dad." The Iowa caseworker said respondent "was not cooperating with them," which McAdams asserting aligned with her own experience with respondent.

¶ 20    Respondent's counsel entered into evidence respondent's lease from February 2022 through February 2023, proof of respondent's address from 2024 until 2025, a W-2 form from Tyson Fresh Meats, and pay stubs from John Deere and Kraft. Counsel also entered a treatment plan from Green Counseling Services, showing respondent scheduled four individual therapy sessions in June 2023. Counsel rested without calling any witnesses.

¶ 21    The trial court found the State proved by clear and convincing evidence, in all three cases, respondent failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare, (2) make reasonable efforts to correct the conditions leading to the children's removal from her care during the specified time frames, and (3) make reasonable progress toward the children's return to her care during the specified time frames. The court observed respondent failed to cooperate with caseworkers or meaningfully engage in the recommended services. Respondent refused to sign consents, did not complete her mental

health assessment until eight months after she was released from jail, and waited an additional four months to complete her psychological evaluation. Respondent did not complete individual counseling, and as a result, therapeutic visitation could not take place. In the few instances where respondent started individual counseling, she was discharged for lack of attendance. Respondent failed to present proof of employment to caseworkers, and she refused to permit caseworkers to inspect her residence.

¶ 22      The matter proceeded to a best interests hearing. Petitioner's counsel moved to continue the hearing because respondent was absent. The guardian *ad litem* argued, "This case has been pending for five years. Mother was well aware of the court date today. She was present when we set it. I believe it's in the best interest of the children to provide them permanency and proceed forward with the case." The trial court denied the motion to continue.

¶ 23      McAdams testified M.C.'s placement changed abruptly in February 2025, following the sudden death of his previous foster mother. M.C. was moved to his current placement, which consisted of relatives of his previous placement. His current foster family was willing to provide permanency in the form of adoption, though additional time would be necessary due to the relatively short time M.C. had lived with them. M.C.'s foster family was very close with S.T-C.'s foster family, and the children saw each other frequently. Based on McAdams's observations, M.C. "fit[s] right in" with his current foster family, and he calls his foster mother "mom." McAdams testified it was in M.C.'s best interests to remain with his current foster family because he knew them well, even before he was placed in their care, and "they have done nothing but shower him with love and blessings." M.C. got along well with his two foster brothers. M.C.'s foster mother treated M.C. like he was her own son.

¶ 24      After McAdams's testimony concluded, the State rested on the best interests

reports prepared for the hearing. The reports, which McAdams prepared, asserted it was in the children's best interests to terminate respondent's parental rights. According to the reports, S.T-C.'s foster family met her needs, she had developed a strong sense of security and stability within her foster family, she was "actively becoming integrated into the community," and her foster family maintains strong ties to both the local community and their church. Likewise, D.L. was securely attached to her foster parents, who met her needs for health, safety, education, and well-being, and they were willing to adopt D.L.

¶ 25    The trial court found it was in all three children's best interests to terminate respondent's parental rights. Regarding S.T-C., the court emphasized her foster family met her basic needs, met her medical needs, and "expressed a strong interest in permanency through adoption." S.T-C. was meeting her developmental milestones, she referred to her foster mother as "mommy," and she identified extended members of her foster family as "aunts and uncles." She had developed a strong sense of security and stability with her foster family, she was integrated into the community, and her foster family "maintains strong ties to the community and the church." Respondent had not visited S.T-C. since December 2021, and S.T-C. "doesn't ask about her biological mother."

¶ 26    The trial court observed M.C.'s current foster family was willing and able to adopt him, and they met his needs for food, shelter, clothing, and healthcare. His academic needs were being met via an individualized education program (IEP), he excelled in sports, and he was meeting his development milestones. He referred to his foster mom as "mommy," her fiancé as "dad," and their extended family members as his "aunts, uncles, and siblings." He was becoming integrated into the community, and his foster family would provide him with continuity, stability, and access to S.T-C. In contrast, respondent had not visited M.C. since December 2021.

¶ 27 Finally, the trial court noted D.L.'s foster family received training to meet D.L.'s extensive medical needs. Under their care, D.L. was progressing both developmentally and physically. D.L. referred to her foster parents as "mom and dad," and she "bonded very well" to them. They met D.L.'s "basic health, safety, education and welfare needs." D.L.'s foster family had the means and income to care for her, and they were able to keep up with her routine medical, dental, and vision appointments. She had an IEP to help with her educational needs. D.L. did not "seem to be aware of her biological parents," and she had no contact with respondent once her case opened. She was securely attached to her foster parents, and they were willing to provide permanency through adoption.

¶ 28 This appeal followed. In February 2025, respondent's appointed appellate counsel filed a motion for leave to withdraw as counsel and attached a supporting memorandum of law, citing *Anders v. California*, 386 U.S. 738 (1967).

¶ 29 II. ANALYSIS

¶ 30 On appeal, respondent's appellate counsel filed a motion seeking leave to withdraw as counsel. Respondent argues her appeal has merit because (1) the trial court denied hearing counsel's motions to continue and conducted the fitness and best interests hearings in her absence and (2) witnesses during the hearings presented hearsay testimony, to which hearing counsel did not object. After reviewing the record and applicable law, we agree with appellate counsel and grant his motion to withdraw as counsel.

¶ 31 A. The Trial Court's Denial of the Motions to Continue

¶ 32 Respondent contends the trial court erred in denying hearing counsel's motions to continue and conducting the fitness and best interests hearings without her. "Although a parent has a right to be present at a hearing to terminate parental rights, presence is not mandatory, and

the trial court is not obligated to delay the proceedings until the parent chooses to appear." *In re J.P.*, 316 Ill. App. 3d 652, 661 (2000); see *In re C.L.T.*, 302 Ill. App. 3d 770, 778-79 (1999) (finding the trial court did not err in denying a motion for continuance where the respondent knew the date of the hearing, a caseworker contacted her on the day of the hearing and offered her a ride, and the respondent's attorney represented her at the hearing in her absence). A parent "does not have an absolute right to a continuance in a proceeding under" the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)), and the decision to grant or deny a motion for a continuance "is a matter within the trial court's discretion." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 53. "[T]he court does not deprive respondent her right to due process by conducting a termination hearing in her absence." *In re S.W.*, 2015 IL App (3d) 140981, ¶ 34. " 'The sole question relating to the denial of [a] motion for a continuance is whether or not the trial court erred in its exercise of judicial discretion.' " *In re S.B.*, 2015 IL App (4th) 150260, ¶ 21 (quoting *Benton v. Marr*, 364 Ill. 628, 630 (1936)).

¶ 33        In determining whether the procedures followed in a parental rights termination proceeding satisfied due process, a reviewing court must balance "(1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value, if any, of additional or substituted procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *In re M.R.*, 316 Ill. App. 3d 399, 402 (2000).

¶ 34        While respondent has an interest in maintaining a parental relationship with her children, the trial court employed procedures that presented "little or no risk of an erroneous deprivation of respondent's interest in parenting her children." *M.R.*, 316 Ill. App. 3d at 402.

- 11 -

Respondent knew the hearing was scheduled for May 28, 2025, because the date was clarified on the record during an earlier hearing, and both respondent and hearing counsel were present when the clarification was made. The court's decision to deny the motions to continue did not render hearing counsel unprepared, and counsel cross-examined witnesses, presented evidence, and argued respondent's case during both the fitness and best interests hearings. The record shows respondent was familiar with the court process in juvenile cases, and she knew how to contact hearing counsel and her caseworkers. Her behavior throughout the pendency of the case indicated an effort to impede the court process. As early as the first appearance, upon being admonished of her rights, respondent advised she was hiring private counsel and refused to accept any copies of the court documents. She also refused to be served with her summons. Throughout the case, respondent requested and obtained multiple continuances. She usually attended hearings, where she repeatedly heard she was not making reasonable progress. At a pretrial hearing before the termination hearing, respondent attempted to present consents for guardianship to forestall termination proceedings, which the court properly refused to accept. She was then conspicuously absent from the termination hearing, which was held on a date set at her behest, with no explanation or advanced notice. Even after the order terminating her parental rights was entered, respondent filed nothing with the trial court seeking to explain her absence. See *C.L.T.*, 302 Ill. App. 3d at 778 (neither the respondent nor her attorney claimed the respondent did not receive notice, and she did nothing to explain her absence). Most importantly, by the time the termination hearing took place, the children's cases had been pending for more than five years. The court did not abuse its discretion in denying the motions to continue, nor did it violate due process by conducting the fitness and best interests hearings without respondent in attendance. See *S.B.*, 2015 IL App (4th) 150260, ¶ 21; *M.R.*, 316 Ill. App. 3d at 402.

¶ 35                    B. The Trial Court's Unfitness Finding

¶ 36        Respondent also argues error occurred where the caseworkers' testimony included hearsay, but hearing counsel did not object. Appellate counsel's supporting memorandum observes Clark testified she contacted a mental health services provider, who provided Clark with a schedule of therapy appointments respondent set up but did not attend. Appellate counsel's memorandum also notes McAdams testified she was informed by a DHS caseworker that respondent was not cooperating, which was consistent with McAdams's experiences with respondent. Hearing counsel did not preserve this argument for appeal by making a contemporaneous objection, but appellate counsel could ask us to consider the issue by conducting a plain error analysis. Alternatively, appellate counsel might also argue hearing counsel provided ineffective assistance by failing to object during the hearing. Appellate counsel's memorandum fails to consider these possibilities. Instead, it merely asserts, "There were no objections to the hearsay testimony, and so it is not preserved for review—thus arguments on those grounds would be frivolous." We are disheartened and unimpressed by the lack of effort appellate counsel has put into his memorandum. However, we agree with his conclusion it would be frivolous to make such an argument for the following reasons.

¶ 37        Both instances of hearsay testimony in question occurred during the fitness hearing. The Adoption Act provides several grounds on which a trial court may find a parent unfit. "[S]ufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83. Here, the trial court found respondent was an unfit parent as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)). Section 1(D)(m)(ii) provides, in part, a parent will be considered an "unfit person" if he or she fails "to

- 13 -

make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected *** or dependent minor." 750 ILCS 50/1(D)(m)(ii) (West 2024). Reasonable progress exists when the evidence shows "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 38        "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta T.*, 2021 IL App (4th) 200658, ¶ 48. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 39        The record shows respondent was required to maintain stable housing and income, complete a mental health assessment and psychological evaluation, and follow any subsequent recommendations. Respondent refused to permit caseworkers to inspect her residence. While the exhibits entered during the fitness hearing indicate respondent remained employed during the case, she refused to sign consents allowing caseworkers to confirm her employment, and she provided proof of employment in the form of pay stubs just once during the case's five years of pendency. Further, respondent did not meaningfully engage in or complete individual counseling, which was not only recommended by her mental health assessment but also served as a prerequisite to starting therapeutic visitation with her children. Because respondent never established an individual therapist, CYFS could not organize therapeutic visits. As a result, respondent did visit the children at any point after she was released

from jail in December 2021. For all these reasons, the trial court's unfitness finding was not against the manifest weight of the evidence, as respondent's inaction and lack of cooperation manifested in a lack of reasonable progress shown during the relevant time frames, and the children were never close to returning to respondent's care. 750 ILCS 50/1(D)(m)(ii) (West 2024); *L.L.S.*, 218 Ill. App. 3d at 461.

¶ 40 The testimony highlighted by appellate counsel's memorandum constituted hearsay because both instances consisted of out-of-court statements presented to prove the truth of the matter asserted. See *People v. Broches*, 2022 IL App (2d) 200001, ¶ 26; Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). While hearing counsel failed to preserve this issue for appellate review by objecting to the testimony (see *People v. Hillier*, 237 Ill. 2d 539, 544 (2010)), we may review it for plain error. *In re N.H.*, 2016 IL App (1st) 152504, ¶ 74. We will find plain error where a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice or (2) the error is so serious that it affected the fairness of the proceedings and challenged the integrity of the judicial process. *N.H.*, 2016 IL App (1st) 152504, ¶ 75; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The hearsay statements do not satisfy either plain error prong, as the evidence overwhelmingly supported the trial court's conclusion respondent was an unfit parent as defined by the Adoption Act, and the court's improper admission of the testimony did not rise to the level of structural error serving to "erode the integrity of the judicial process and undermine the fairness of the [hearing]." *People v. Herron*, 215 Ill. 2d 167, 186 (2005).

¶ 41 Additionally, it would be frivolous to argue on appeal that hearing counsel provided ineffective assistance when he did not object to the hearsay testimony in question because respondent cannot demonstrate she suffered prejudice as a result. See *People v.*

*Domagala*, 2013 IL 113688, ¶ 36 ("To prevail on a claim of ineffective assistance of counsel, a [respondent] must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the [respondent]."). To establish prejudice, respondent must show there is a reasonable probability the result of the proceedings would have been different but for counsel's allegedly deficient performance. *Domagala*, 2013 IL 113688, ¶ 36. The hearsay statements in question established respondent was unsuccessfully discharged from Green Counseling Services for lack of attendance, and she was not cooperating with DHS regarding her new case there. This information can be gleaned from elsewhere in the record. Respondent's failure to engage in individual counseling is demonstrated by CYFS's inability to begin therapeutic visitation, which required respondent to engage in individual counseling and obtain her therapist's approval. Respondent's lack of cooperation with CYFS is manifested in a plethora of ways, including her refusal to sign consents, allow caseworkers to inspect her residence, or provide proof of employment more than once over the course of the case's five years of pendency. There is not a reasonable probability that, but for hearing counsel's failure to object to the hearsay testimony, the proceedings below would have been different. See *Domagala*, 2013 IL 113688, ¶ 36. We agree with appellate counsel no issue of arguable merit can be raised regarding the court's fitness finding or the hearsay testimony presented during the fitness hearing.

¶ 42                      C. The Trial Court's Best Interests Findings

¶ 43        We also find it would be frivolous to argue the trial court's best interests findings were in error. After a parent is found unfit, "the focus shifts to the child." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The issue ceases to be "whether parental rights can be terminated" and becomes "whether, in light of the child's needs, parental rights should be terminated." (Emphases

omitted.) *D.T.*, 212 Ill. 2d at 364. The trial court will consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). See *In re T.A.*, 359 Ill. App. 3d 953, 959-60 (2005). Those factors include the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background and ties; the child's sense of attachments, including where the child feels loved, attached, and valued; the child's sense of security, familiarity, and continuity of affection; the child's wishes and long-term goals; the child's community ties; the child's need for permanence; and the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West 2024). We will not overturn a court's best interests finding unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 44    The evidence shows the best interests factors supported the termination of respondent's parental rights. S.T-C., M.C., and D.L. were all placed with foster families who met their needs and were willing to provide permanency in the form of adoption. Each child referred to their foster parents as "mommy" or "mom" and "dad." S.T-C. and M.C. were reaching their appropriate developmental milestones, and D.L. was progressing both physically and developmentally. M.C.'s and D.L.'s respective foster families ensured they had IEPs to aid their education. S.T-C. and M.C. were able to see each other frequently because their foster families were very close. D.L.'s foster family received special training to ensure they met her extensive medical needs, and she "bonded very well" to them. Respondent did not visit the children after December 2021, ask caseworkers how they were doing, or send them gifts or cards on special occasions. Based on the evidence presented, the trial court's finding of unfitness was not manifestly erroneous, as the opposite conclusion was not clearly apparent. *Jay. H.*, 395 Ill. App. 3d at 1071. We agree with appellate counsel that no arguably meritorious issue can be raised on

- 17 -

appeal.

¶ 45                                    III. CONCLUSION

¶ 46            For the reasons stated, we grant appellate counsel's motion to withdraw and

affirm the trial court's judgment.

¶ 47            Affirmed.